IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOG CABIN HOMES LTD., | ) | CASE NO 8:11-CV-102 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **BRIEF IN SUPPORT OF** |
| v. | ) | **PLAINTIFF'S MOTION FOR** |
| | ) | **TEMPORARY RESTRAINING** |
| CABELA'S MARKETING AND BRAND | ) | **ORDER AND PRELIMINARY** |
| MANAGEMENT, | ) | **INJUNCTION** |
| | ) | |
| Defendant. | ) | |

On March 17, 2011, without prior notice to Log Cabin Homes, Cabela's wrongfully contacted Log Cabin Homes' web host and demanded that the web host disable Log Cabin Homes' entire web site (the majority of which had nothing to do with Cabela's). Because Log Cabin Homes conducts the vast majority (more than 90%) of its business operations via its Internet web site, Cabela's illegal and draconian self-help remedy has essentially shut down Log Cabin Homes' entire business operation. Log Cabin Homes seeks immediate temporary injunctive relief to ensure that its business operations may resume, to ensure that it can maintain the jobs of many long-time employees, to minimize the damage to its reputation and goodwill, and to minimize significant financial losses that have been and will otherwise continue to be incurred. Immediate relief is absolutely necessary.

### I. BACKGROUND

Log Cabin Homes has had a relationship with Cabela's dating back to 2008. On August 1, 2010, the parties executed a new Licensing Agreement which generally provided that Log Cabin Homes could use Cabela's trademarks ("Licensed Marks") in connection with the manufacture, sale, marketing, and distribution of log cabin homes. The Licensing Agreement gives Log Cabin Homes an exclusive right to use the Licensed Marks in the field of log cabins

and log homes.  The Licensing Agreement is to be effective through December 31, 2015.  Log Cabin Homes has invested millions of dollars in its relationship with Cabela's.

Before executing the Licensing Agreement, Log Cabin Homes introduced Cabela's to The Bentley Group ("Bentley"), a private equity firm with which Log Cabin Homes has a relationship.  Bentley is developing several resort properties throughout the United States and proposed to purchase several thousand log cabin homes from Log Cabin Homes provided they were the licensed product with Cabela's name.  Upon learning about Bentley, Cabela's began secretly negotiating with Bentley (without disclosing the negotiations to Log Cabin Homes) for a license agreement that would allow Bentley to use the Licensed Marks to promote log cabin home furnishings, and even provided Bentley with a proposed license agreement with a proposed effective date of October 1, 2010.

While Cabela's was secretly negotiating with Bentley, Cabela's completely changed its tone with Log Cabin Homes.  Although the parties had cooperated and communicated openly for several years without incident, Cabela's suddenly claimed on November 8, 2010 that the manner in which Log Cabin Homes had historically used the Licensed Marks violated the parties' Licensing Agreement.  This was the first time Cabela's took issue with Log Cabin Homes' performance under the Licensing Agreement or the parties' prior agreements.  Cabela's stopped returning Log Cabin Homes' calls and ceased all meaningful communications in November and December, 2010.

On December 30, 2010, Log Cabin Homes received a letter from Cabela's advising that Cabela's unilaterally considered the Licensing Agreement to be terminated as of December 31, 2010, because Cabela's thought the parties' business relationship had broken down and was "beyond repair."  The purported notice of termination did not allege any breach of the Licensing

Agreement as had been claimed in the November 8, 2010 letter. Cabela's asked Log Cabin Homes to agree to the purported termination by signing the December 30 letter and to return the signed letter by express delivery to Cabela's. Log Cabin Homes quickly responded to Cabela's and advised that it would not agree to terminate the Licensing Agreement. Log Cabin Homes requested a meeting to work through the parties' differences --- a request that Cabela's ignored, consistent with how Cabela's had treated similar requests in November and December, 2010.

On January 19, 2011, Cabela's sent another letter to Log Cabin Homes. In the January 19, 2011 letter, Cabela's did not claim the Licensing Agreement had been terminated due to a breach of the Licensing Agreement or due to a breakdown of the parties' relationship, as it had previously claimed. Instead, Cabela's asserted for the first time that it had terminated the Licensing Agreement because Log Cabin Homes had "repeatedly repudiated" the Licensing Agreement. This was the first time Cabela's took the position that Log Cabin Homes had repudiated the Licensing Agreement, and it came as a shock to Log Cabin Homes because Log Cabin Homes had invested millions of dollars in its relationship with Cabela's and relies on its relationship with Cabela's for the well-being of its company. At no time did Log Cabin Homes repudiate the Licensing Agreement.

By its terms, the parties' Licensing Agreement is to last through December 31, 2015. A non-breaching party may terminate the Licensing Agreement if it gives the other party sixty days to cure a non-monetary breach and the party fails to cure said breach. Cabela's did not give Log Cabin Homes sixty days notice to cure any alleged breaches; in fact, Cabela's did not give Log Cabin Homes any opportunity at all to cure an alleged breakdown in the parties' business relationship, nor did Cabela's give Log Cabin Homes any opportunity at all to cure any alleged repudiation of the Licensing Agreement. Log Cabin Homes did not even know Cabela's had

purported to terminate the Licensing Agreement based on an alleged "repudiation" until January 19, 2011, three weeks after Cabela's sent its purported notice of termination. Simply put, Cabela's had no right to terminate the Licensing Agreement, and the agreement remains in full force and effect.

Cabela's filed suit against Log Cabin Homes on March 9, 2011, and alleged in its Complaint that it terminated the Licensing Agreement due to Log Cabin Homes repudiation of the Licensing Agreement. Although Cabela's stated in its Complaint that it sought preliminary injunctive relief to prevent Log Cabin Homes from using the Licensed Marks on Log Cabin Homes' web site, Cabela's chose not to file a motion for preliminary injunction with the Court. Instead, Cabela's took matters into its own hands and unilaterally contacted Log Cabin Homes' web host (Wild West Domains), and demanded that Wild West Domains disable Log Cabin Homes' entire web site (www.logcabinhomes.com) based upon Log Cabin Homes' use of the Licensed Marks on a few pages of the web site. Wild West Domains complied with Cabela's demand, suspended Log Cabin Homes' web hosting account, and disabled Log Cabin Homes' entire web site, including those pages which contained no reference whatsoever to Cabela's or the Licensed Marks.

Log Cabin Homes immediately contacted Wild West Domains and demanded that it restore the web site. Wild West Domains responded by telling Log Cabin Homes to resolve the matter by contacting Cabela's directly to resolve the issue with Cabela's. Wild West Domains specifically said it would restore the web site upon Cabela's request. Log Cabin Homes then wrote to Cabela's and demanded that Cabela's ask Wild West Domains to restore the web site. Cabela's has failed and refused to take such action.

More than ninety percent (90%) of Log Cabin Homes' sales and revenues are generated though its Internet web site. Log Cabin Homes has 24 salespersons whose primary job duty is to monitor customers' use of the web site and engage in "live chats" with customers who are browsing the web site in an effort to answer questions and promote sales. Those 24 employees have essentially been unable to work since March 17, 2011, when the web site was disabled. Log Cabin Homes has another 41 employees whose jobs depend on the salespersons making sales. If the web site is not restored, Log Cabin Homes will have no choice but to begin cutting back its workforce, resulting in lost jobs, including some persons who have been long-time employees of the company. In the meantime, Log Cabin Homes has no way to identify the specific people, or number of people, who have attempted to visit its web site since the site was disabled on March 17, 2011. Log Cabin Homes is experiencing a significant loss of reputation and goodwill as a result of Cabela's "self-help" in having the web site disabled. Of course, Cabela's has posted no bond to cover these substantial losses which Log Cabin Homes has incurred and will continue to incur each day that the web site is disabled. At present, Log Cabin Homes' entire business operation has essentially been shut down, all based on Cabela's trademark infringement allegation which is premised on Cabela's improper and unlawful purported termination of the Licensing Agreement.

Log Cabin Homes seeks immediate injunctive relief to ensure that its business operations may resume, to ensure that it can maintain the jobs of many long-time employees, and to minimize the damage to its reputation and goodwill. Absent an immediate temporary injunction, Cabela's will essentially be allowed to drive Log Cabin Homes out of business based on false allegations and Cabela's tortious interference with Cabela's web host and its business expectancies with Internet customers.

## II. LEGAL STANDARDS

### A. Standard for Temporary Restraining Order

The Court weights the same factors to determine whether a temporary restraining order should issue as it does to determine whether a preliminary injunction should issue. See Planned Parenthood of the Heartland v. Heineman, 2010 WL 2773437 at *8 (D.Neb. 2010).

### B. Standard for Preliminary Injunction

The issuance of a preliminary injunction is governed by Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc). In determining whether a preliminary injunction should issue, the trial court should consider the following factors: (1) the probability that plaintiff will succeed on the merits; (2) the threat of irreparable harm to the plaintiff; (3) the state of balance between such harm and the injury that granting the injunction will inflict on other parties litigant; and (4) the public interest. See Dataphase, 640 F.2d 109 (8th Cir. 1981). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." Baker Elec. Co-op v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) (quoting Calvin Klein Cosmetic Corp. v. Lenox Labs, Inc., 815 F.2d 500, 503 (8th Cir. 1987), and also citing Dataphase).

## ARGUMENT

### A. Log Cabin Homes Has No Adequate Remedy At Law And Will Suffer Irreparable Harm Unless A Temporary Restraining Order And Preliminary Injunction Are Issued.

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959). In the absence of a temporary restraining order and preliminary injunction, Cabela's can continue to hold Log Cabin Homes' web site hostage and can continue to deprive Log Cabin Homes of

the source of more than ninety percent (90%) of its revenues. Without a preliminary injunction, damage to Log Cabin Homes' business, reputation, and goodwill will continue to accrue because consumers are unable to even find the company on the Internet, let alone purchase any products from the company. "Loss of intangible assets such as reputation and goodwill can constitute irreparable harm because 'harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars.'" United Healthcare Ins. Co. v. Advance PCS, 316 F.3d 737, 741 (8th Cir. 2002); Medicine Shoppe Intern., Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003); see also WWP, Inc. v. Wounded Warriors, Inc., 566 F.Supp.2d 970, 978 (D.Neb. 2008) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury.").

A substantial number of employees who focus on Log Cabin Homes' Internet presence are also unable to work while the web site is disabled, and thus Log Cabin Homes is likely to suffer irreparable harm in the form of a loss of employees if the web site is not promptly restored.

In addition to the above-stated damages for which there is no adequate remedy at law, there is also no adequate remedy at law for lost Internet sales because Log Cabin Homes does not presently know who wants to access its web site but cannot do so, nor does it know how many customers and prospective customers have unsuccessfully attempted to access the web site.

**B.      Log Cabin Homes Will Succeed On The Merits Of Its Claims.**

At this preliminary injunction stage, Log Cabin Homes need only demonstrate that it has a "fair chance" of prevailing on the merits of one of its claims. Planned Parenthood of Minnesota, North Dakota and South Dakota v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008); Eve of Milady v. Impression Bridal, Inc., 957 F.Supp. 484, 487 (S.D.N.Y. 1997) ("Where a plaintiff seeks preliminary injunction and asserts multiple claims upon which relief may be granted, the

plaintiff need only establish a likelihood of success on the merits of one of the claims."). Log Cabin Homes has more than a "fair chance" of prevailing on its claims for which injunctive relief is requested.

To prevail on a claim for tortious interference with a business relationship or expectancy, Log Cabin Homes must demonstrate the following elements: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. Controlled Rain, Inc. v. Sanders, 2006 WL 1222772 at *15 (Neb.App. 2006) (citing Macke v. Pierce, 266 Neb. 9, 661 N.W.2d 313 (2003)).

Here, Log Cabin Homes has clearly demonstrated that it has a fair chance of prevailing on its tortious interference claims. There can be no real dispute that Log Cabin Homes has a valid business relationship with its web host, Wild West Domain, and similar has valid business expectancies with its Internet customers and prospective Internet customers. Likewise, there can be no real dispute that Cabela's was aware of the relationship with Wild West Domains and the expectancies with Internet customers and prospective customers. Likewise, Cabela's conduct clearly resulted in the shutdown of Log Cabin Homes' web site, and thus the interference caused the claimed harm and resulted in damages to Log Cabin Homes.

It is anticipated that Cabela's will argue that its conduct in having Log Cabin Homes' web site shut down was "justified." However, the evidence demonstrates that Log Cabin Homes is likely to prevail in demonstrating just the opposite. Cabela's argument will necessarily be premised on the notion that it properly terminated its Licensing Agreement with Log Cabin

8

Homes. The evidence shows that Cabela's did not properly terminate the Licensing Agreement for many reasons, including but not limited to the following:

1. Cabela's has repeatedly changed its story about the basis for its purported termination of the Licensing Agreements. Cabela's initially claimed Log Cabin Homes breached the Licensing Agreements (November 8, 2010 letter). Cabela's then claimed it was terminating the Licensing Agreement because the parties' relationship was "beyond repair." (December 30, 2010 letter). Cabela's then took the position after the fact, and now takes the position in a related lawsuit, that it terminated the Licensing Agreement based upon Log Cabin Homes' "repudiation" of the Licensing Agreement. None of these reasons are factually or legally proper.

2. The Licensing Agreement is to last until December 31, 2015. It may only be terminated before that time if a party materially breaches the Licensing Agreement and fails to cure a non-monetary breach within sixty (60) days after receiving written notice from the non-breaching party. Here, Cabela's did not provide written notice and an opportunity to cure regarding either the breakdown of the parties' relationship or Log Cabin Homes' repudiation of the Licensing Agreement. The December 30, 2010 letter purporting to terminate the Licensing Agreement came less than sixty days after the first ever notice received by Cabela's regarding any problems with their relationship (and the termination was based on entirely separate reasons than those set forth in the November 8 letter).

3. The Licensing Agreement does not allow for one party to terminate the agreement due to a breakdown of the parties' business relationship. A material breach is required.

4. Log Cabin Homes did not intend to repudiate the Licensing Agreement, nor would it make any sense for Log Cabin Homes to do so. Log Cabin Homes has invested millions of dollars in its relationship with Cabela's and it depends upon that relationship for the success of its business.

5. Cabela's basis for its after-the-fact contention that the Licensing Agreement was terminated due to Log Cabin Homes' repudiation are statements from Mr. Tom Vesce to the effect that Log Cabin Homes could not perform the contract under the then-existing conditions. As explained by Mr. Vesce in his Declaration, Log Cabin Homes needed Cabela's input on various contract-related matters and Cabela's had essentially ceased all meaningful communications with Log Cabin Homes, thus making it difficult for Log Cabin Homes to work with Cabela's. Mr. Vesce's comments were made in the context of requesting a meeting to attempt to work through the parties' differences, which is very different that repudiating the contract.

6. Cabela's was pursuing other license agreements with third parties such as Bentley in the field of log cabins and log homes, despite the contractual provision giving Log Cabin Homes the exclusive right to use the Licensed Marks in this field.

Because Cabela's did not have the right to unilaterally terminate the Licensing Agreement and its purported notice of termination was not effective, Cabela's likewise had no right to contact Wild West Domains and advise Wild West Domains that Log Cabin Homes' use

of the Licensed Marks was improper and not allowed by the parties' Licensing Agreement. Cabela's statements to Wild West Domains were materially false, unjustified, improper, and easily establish the third element of each tortious interference claim.

Accordingly, Log Cabin Homes is likely to prevail on its tortious interference claims against Cabela's.

**C.    The Balance Of Relative Harms Weigh In Favor of Log Cabin Homes.**

The third factor to consider is "the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant . . ." Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981). The hardship to Log Cabin Homes by not granting the preliminary injunction outweighs any hardship to Cabela's as a result of the issuance of an injunction. In the event that a temporary restraining order and preliminary injunction are not entered, Log Cabin Homes will be forced to operate its business without the benefit of its web site, which is responsible for more than ninety percent (90%) of the company's revenues. As evidenced by Tom Vesce's Declaration, the absence of an Internet web site has essentially shut down Log Cabin Homes' entire business operations. Significantly, Cabela's conduct has resulted in Log Cabin Homes' entire web site being disabled, including those parts of the web site which make no reference at all to Cabela's or its trademarks. In addition, Log Cabin Homes does not know who or how many customers have unsuccessfully attempted to visit its web site while the web site has been disabled. As the web site remains down, Log Cabin Homes will continue to suffer damage to its business, reputation, and goodwill because of the inability to allow customers and vendors to visit or purchase items from its web site. Log Cabin Homes also has 65 employees, 24 of whom are devoted to interacting with visitors to Log Cabin Homes' web site, and those employees are currently unable to perform any services, and Log Cabin Homes

will be irreparably harmed through the loss of employees if those employees are not able to work.

Cabela's, comparatively, will not suffer significant harm if a temporary restraining order or preliminary injunction is issued. Cabela's entered into the Licensing Agreement with Log Cabin Homes, and Cabela's can hardly contend that it will be harmed if it is required to honor the terms of the five-year agreement it executed just last fall.

**D.      The Public Interest Will Be Served By The Court's Issuance Of An Injunction.**

As set forth above, an entire company has been essentially shut down as a result of Cabela's decision to seek its self-help remedy. Entry of an injunction enable the company to resume operations and will serve the public interest by maintaining consumer choice and convenience in the log cabin home industry. See General Motors Corp.v. Harry Brown's, LLC, 563 F.3d 312, 321 (8th Cir. 2009) ("The public also has an interest in maintaining consumer choice and convenience in the automobile market."). The public interest will also be served by ensuring that the jobs of Log Cabin Homes' 65 employees are not in jeopardy. Id. (public interest was served in maintaining 19 jobs). Public policy also favors upholding valid contracts, such as the parties' Licensing Agreement. E.g., Smart & Co., Inc. v. Food Systems Global Co. Ltd., 2008 WL 4381679 (D.Minn. Sept. 26, 2008).

## CONCLUSION

For the foregoing reasons, Log Cabin Homes respectfully requests a temporary restraining order and preliminary injunction as follows:

1.      Requiring Cabela's to contact Wild West Domains to withdraw its prior notice of alleged trademark infringement, and request that Wild West Domains fully restore Log Cabin Homes' web site as it existed prior to March 17, 2011;

2. Requiring Cabela's to contact all third parties it has advised that the Licensing Agreement is terminated or that Log Cabin Homes is infringing Cabela's marks, and withdraw all such notifications in writing;

3. Enjoining Cabela's from contacting Wild West Domains, or any other third party, to allege infringement of the Cabela's trademarks by Log Cabin Homes or that the Licensing Agreement has been terminated; and

4. Requiring Cabela's to file with the Court and serve upon Log Cabin Homes within twenty-four (24) hours after entry of an injunction, a sworn written report setting forth in detail the manner in which it has complied with such injunction order.

Dated this 21st day of March, 2011.

Respectfully submitted,

LOG CABIN HOMES LTD., Plaintiff

By: /s/ Mark C. Laughlin
Mark C. Laughlin # 19712
Patrick S. Cooper #22399
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102
(402) 341-6000
mlaughlin@fraserstryker.com
pcooper@fraserstryker.com

**CERTIFICATE OF SERVICE**

  I hereby certify that on the 21st day of March, 2011, I electronically filed the foregoing with the Court using the CM/ECF system, and e-mailed a copy of the document to the following:

Tom Dahlk
tom.dahlk@huschblackwell.com

Victoria Buter
vicki.buter@huschblackwell.com

Alan Barry
Allan.barry@klgates.com

Christopher Fahy
Christopher.fahy@klgates.com

                /s/ Mark C. Laughlin

581318.02