# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LOG CABIN HOMES LTD., | Case No. 8:11-cv-00102 |
| Plaintiff, | Judge Laurie Smith Camp |
| v. | Magistrate Judge F.A. Gossett |
| CABELA'S MARKETING AND BRAND MANAGEMENT, | |
| Defendant. | |

## CABELA'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant Cabela's Marketing and Brand Management ("Cabela's"), by and through its attorneys, answers the Complaint of Log Cabin Homes, Ltd. ("LCH") as follows:

## I. THE PARTIES

1. Plaintiff LOG CABIN HOMES LTD. ("Log Cabin Homes") is a Delaware corporation with its principal place of business in Rocky Mount, North Carolina.

**ANSWER:** Admitted.

2. Defendant Cabela's Marketing and Brand Management ("Cabela's") is a Nebraska corporation with its principal place of business in Sidney, Nebraska.

**ANSWER:** Admitted.

## II. JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1338, and 1367, as this is a civil action between citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**ANSWER:** Admitted that the Court has subject matter jurisdiction over this action but denied as to the remaining allegations.

4. The Court has personal jurisdiction over Cabela's because Cabela's resides in and transacts business in this judicial district.

**ANSWER:** Admitted.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a), in that Cabela's transacts business in this judicial district and some part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

**ANSWER:** Admitted that venue is proper and Cabela's transacts business in this judicial district but denied as to the remaining allegations.

### III. BACKGROUND

A. **The Parties' Licensing Agreement**

6. Log Cabin Homes was founded in 1987 and is in the business of manufacturing, marketing, distributing, and selling log cabin homes. Log Cabin Homes conducts the vast majority (more than 90%) of its business via its web site, www.logcabinhomes.com, on the Internet. It is a "paperless" company to the extent practicable in that all catalogs, product specifications, and other information is available only through its Internet web site. Log Cabin Homes has had a business relationship with Cabela's since at least 2008 when it entered into the first of three contracts with Cabela's by which Log Cabin Homes was designated "the official log home provider of Cabela's" as part of Cabela's Corporate Partnership and Licensing Program.

**ANSWER:** Admitted that LCH has had a business relationship with Cabela's since 2008 but denied as to the remaining allegations related to Cabela's. Cabela's is without sufficient knowledge or information to form a belief as to truth of the remaining averments of this paragraph.

7. Cabela's conducts a Corporate Partnership and Licensing Program to align Cabela's promotional efforts in promoting the outdoors and outdoor activities with reputable corporations for the purpose of improving the quality of services and experiences Cabela's offers to outdoor enthusiasts.

**ANSWER:** Admitted.

8. On or about August 1, 2010, Cabela's and Log Cabin Homes entered into a Licensing Agreement whereby Log Cabin Homes was to participate in Cabela's Corporate Partnership and Licensing Program as a corporate partner. Execution of the Licensing

Agreement ensured that Log Cabin Homes could continue using the Licensed Marks through December 31, 2015.

**ANSWER:** Admitted that on or about August 1, 2010, Cabela's and LCH entered into a Licensing Agreement whereby LCH was to participate in Cabela's Corporate Partnership and Licensing Program as a corporate partner but denied as to the remaining allegations of this paragraph.

9. Pursuant to the Licensing Agreement, Cabela's granted Log Cabin Homes a license to use Cabela's trademarks ("CABELA'S, the "CABELA'S Signature Logo", and other marks designated by the parties) (hereafter "the Licensed Marks") in connection with the manufacture, marketing, distribution, and sale of Log Cabin Homes' log cabin products and components thereof.

**ANSWER:** Admitted that LCH had a license to use certain Cabela's trademarks, but denied as to the characterization of the scope and nature of the license.

10. The Licensing Agreement was effective beginning August 1, 2010 and shall continue until December 31, 2015. The Licensing Agreement provides that a non-breaching party may terminate the agreement prior to December 31, 2015 "due to a material breach of any of the terms or provisions of this Agreement, provided written notice of such material breach is given to the breaching party and the breaching party fails to cure such breach within thirty (30) days of receipt of such notice in the case of monetary breach; and within sixty (60) days of receipt of such notice in the case of nonmonetary breach."

**ANSWER:** Admitted that the Licensing Agreement includes the quoted portion of this paragraph but denied as to the remaining allegations of this paragraph.

11. Since entering into the Licensing Agreement with Cabela's, Log Cabin Homes has engaged in a massive program to carry out the parties' agreement. Log Cabin Homes has expended millions of dollars on marketing, promotion, design, and other business activities to promote this venture. Pursuant to Log Cabin Homes' efforts, it introduced Cabela's to The Bentley Group ("Bentley"), which is a private equity group with which Log Cabin Homes had a prior relationship. Bentley is developing several resort properties throughout the United States and proposed to purchase several thousand log cabin homes from Log Cabin Homes provided they were the licensed product with Cabela's name.

**ANSWER:** Cabela's is without sufficient knowledge or information to form a belief as to truth of the averments of this paragraph and therefore denies same.

12. Upon being introduced to Bentley and seeing the huge quantity of business that this single customer represented, and despite the existing agreement with Log Cabin Homes, Cabela's secretly entered into negotiations directly with Bentley (without disclosing such negotiations to Log Cabin Homes) to avoid Cabela's obligations to Log Cabin Homes and to enable Cabela's to deal directly with Bentley for log cabin homes. A proposed license agreement was drafted and forward by Cabela's to Bentley, whereby Cabela's sought to license its trademarks to Bentley for use in connection furnishing the official log cabin home, and provided for an October 1, 2010 commencement of the parties' agreement. Bentley did not ultimately sign the proposed license agreement.

**ANSWER:** Denied.

13. However, Cabela's took other actions to attempt to terminate its Licensing Agreement with Log Cabin Homes. On November 8, 2010, Log Cabin Homes received a letter from Cabela's attorney advising that Cabela's objected to certain uses to which Log Cabin Homes had made of Cabela's licensed trademarks. This was the first time Log Cabin Homes had received any such objections from Cabela's, despite the fact that Log Cabin Homes had made similar uses of the licensed trademarks for several years under the parties' marketing agreements, and subsequently the Licensing Agreement.

**ANSWER:** Admitted that on November 8, 2010, Cabela's attorney sent a letter to LCH detailing numerous unauthorized uses of Cabela's marks but denied as to the remaining allegations in this paragraph.

14. Consistent with its longstanding practice under the marketing and Licensing Agreements, Log Cabin Homes sought to respond promptly and to discuss any issues raised by Cabela's. During November and December, 2010, Log Cabin Homes sent written correspondence to Cabela's and initiated telephone communications regarding the parties' interpretations of the scope of the Licensing Agreement. Cabela's refused to answer Log Cabin Homes' questions. Cabela's likewise refused to meet with Log Cabin Homes to discuss how to deal with the situation.

**ANSWER:** Admitted that the parties exchanged written correspondence during November and December, 2010, but denied as to the remaining allegations of this paragraph.

15. On November 8, 2010, Cabela's first notified Log Cabin Homes that it disagreed as to the scope of the Licensing Agreement and stated that it believed Log Cabin Homes' use of the Cabela's licensed trademarks was in violation of the Licensing Agreement.

**ANSWER:** Admitted that on November 8, 2010, Cabela's attorney sent a letter to LCH detailing numerous unauthorized uses of Cabela's marks but denied as to the remaining allegations in this paragraph.

16. On December 30, 2010, Cabela's sent a letter to Log Cabin Homes purporting to terminate the Licensing Agreement. Unlike the reasons stated in the November 8, 2010 letter, the December 30, 2010 letter did not allege a violation of the Licensing Agreement; rather, Cabela's asserted that it considered the Licensing Agreement terminated because it believed the parties' business relationship was "beyond repair." Specifically, Cabela's stated as follows: "It has become apparent to Cabela's, and perhaps to your company as well, that our business relationship is beyond repair. For that reason, Cabela's believes that the Licensing Agreement dated August 1, 2010 between Cabela's Marketing and Brand Management and your company must be terminated. Therefore, as of close of business Eastern Standard Time, on December 31, 2010, Cabela's will consider the Licensing Agreement terminated. So that the termination will be mutual, please sign and date a copy of this letter where indicated below and return it to me by overnight delivery service." Log Cabin Homes did not agree to terminate the Licensing Agreement.

**ANSWER:** Admitted that this paragraph contains quotations from Cabela's December 30, 2010 correspondence but denied as to the remaining allegations.

17. On or about January 19, 2011, Cabela's sent a letter to Log Cabin Homes asserting yet another new, different, and previously unstated reason for its purported termination of the Licensing Agreement. In this letter, Cabela's asserted it had terminated the Licensing Agreement due to an alleged "repudiation" of the Licensing Agreement by Log Cabin Homes.

**ANSWER:** Admitted that Cabela's attorney sent a letter to LCH on January 19, 2011, detailing LCH's repudiation of the License Agreement but denied as to the remaining allegations and characterizations.

18. At no time did Log Cabin Homes repudiate the Licensing Agreement, nor did Cabela's ever advise Log Cabin Homes, before purporting to terminate the Licensing Agreement, that Cabela's believed Log Cabin Homes had repudiated the Licensing Agreement. At no time did Cabela's agree to meet with Log Cabin Homes to discuss alleged differences or problems.

**ANSWER:** Denied.

## B. The First Lawsuit

19. On or about March 9, 2011, Cabela's filed a lawsuit against Log Cabin Homes in the United States District Court for the District of Nebraska. In the lawsuit, Cabela's generally alleges Log Cabin Homes infringed the Licensed Marks by continuing to use those marks in connection with the manufacture, sale, distribution, and/or marketing of its log cabin homes after December 31, 2010.

**ANSWER:** Admitted that Cabela's filed a lawsuit against LCH in the United States District Court for the District of Nebraska on March 9, 2011 but denied as to the remaining allegations and characterizations.

20. In the lawsuit, Cabela's does not allege, as it had in its December 30, 2010 letter, that the Licensing Agreement was terminated due to the breakdown of the parties' business relationship. Rather, Cabela's alleges that the Licensing Agreement was terminated due to Log Cabin Homes' "repeated repudiation" of the agreement.

**ANSWER:** Admitted that Cabela's lawsuit alleges that the Licensing Agreement was terminated due to LCH's "repeated repudiation" of the Licensing Agreement but denied as to the remaining allegations and characterizations.

21. Log Cabin Homes did not repudiate the Licensing Agreement. The Licensing Agreement remains in full force and effect.

**ANSWER:** Denied.

22. In its Complaint, Cabela's states that it seeks preliminary injunctive relief enjoining Log Cabin Homes from using the Licensed Marks and requiring Log Cabin Homes to eliminate its web site and other advertising which used the Licensed Marks. However, Cabela's did not file a Motion for Preliminary Injunction or otherwise pursue preliminary injunctive relief in this Court. Instead, Cabela's resorted to self-help by improperly causing Log Cabin Homes' entire web site to be shut down. Cabela's self-help is described more fully in Paragraphs 23 through 25 below.

**ANSWER:** Admitted that in its Complaint, Cabela's seeks preliminary injunctive relief enjoining Log Cabin Homes from using the Licensed Marks but denied as to the remaining allegations and characterizations.

C. **Cabela's Improper "Self-Help"**

23. On or about March 17, 2011, without notice to Log Cabin Homes, Cabela's attorney Christopher J. Fahy sent a letter to Wild West Domains, Inc., the web host for Log Cabin Homes' web site, www.logcabinhomes.com. In the letter, Cabela's alleged that Log Cabin Homes was a "former licensee" of the Licensed Marks, that the Licensing Agreement was terminated "based on repeated repudiation of the parties' license agreement by Log Cabin Homes," and that Log Cabin Homes was infringing the Licensed Marks "throughout its web site."

**ANSWER:** Admitted that on or about March 17, 2011, Cabela's attorney Christopher J. Fahy sent a letter to Wild West Domains, Inc., the web host for Log Cabin Homes' web site, www.logcabinhomes.com alleging that Log Cabin Homes was a "former licensee" of the Licensed Marks, that the Licensing Agreement was terminated "based on repeated repudiation of the parties' license agreement by Log Cabin Homes," and that Log Cabin Homes was infringing the Licensed Marks "throughout its web site." Denied as to the remaining allegations.

24. Wild West Domains received Cabela's letter in the morning of March 17, 2011. That afternoon, without first contacting Log Cabin Homes, Wild West Domains suspended Log Cabin Homes' web hosting account and disabled Log Cabin Homes' entire web site, including pages which make no reference to Cabela's whatsoever. A true and correct copy of what has displayed to customers who have attempted to visit Log Cabin Homes' web site since March 17, 2011 is attached hereto as Exhibit "A." Because the vast majority (i.e., more than ninety percent) of Log Cabin Homes' sales and revenues are generated through the company's web site, Cabela's conduct has essentially resulted in a complete shutdown of Log Cabin Homes' entire business operations.

**ANSWER:** Cabela's is without sufficient knowledge or information to form a belief as to truth of the averments of this paragraph and therefore denies same.

25. On March 18, 2011, Log Cabin Homes requested that Wild West Domains restore Log Cabin Homes' web site, but Wild West Domains refused and advised Log Cabin Homes in pertinent part as follows: "[I]n order to have the hosting account restored, you will need to contact the complaining party [Cabela's attorney] and resolve this issue with them directly. The complaining party will then need to contact us and request that we restore access to the hosted content."

**ANSWER:** Cabela's is without sufficient knowledge or information to form a belief as to truth of the averments of this paragraph and therefore denies same.

26. On March 18, 2011, Log Cabin Homes sent a letter to Cabela's attorney Christopher Fahy, advising Cabela's that Wild West Domains had shut down Log Cabin Homes' entire web site, advising that the shutdown was causing irreparable harm and substantial damages to Log Cabin Homes, and demanding that Cabela's contact Wild West Domains to have Log Cabin Homes' web site restored. Cabela's has failed and refused to contact Wild West Domains to have Log Cabin Homes' web site restored.

**ANSWER:** Admitted that on March 18, 2011, Log Cabin Homes sent a letter to Cabela's attorney Christopher Fahy, advising Cabela's that Wild West Domains had shut down Log Cabin Homes' entire web site, alleging that the shutdown was causing irreparable harm and substantial damages to Log Cabin Homes, and demanding that Cabela's contact Wild West Domains to have Log Cabin Homes' web site restored. Denied as to the remaining allegations.

**D.** **Damages / Irreparable Harm Caused by Cabela's "Self-Help"**

27. Despite having prepared a lawsuit seeking preliminary injunctive relief, Cabela's essentially through self-help provided itself with the ultimate remedy it is seeking from this Court without any notice of Log Cabin Homes. Cabela's actions in contacting Wild West Domains and having Log Cabin Homes' web site disabled has essentially resulted in, and will continue to result in, substantial damages, monetary and otherwise, to Log Cabin Homes, including but not limited to the following particulars:

• Shutdown of Log Cabin Homes' Business Operations. More than ninety percent (90%) of Log Cabin Homes' sales originate from Log Cabin Homes' web site. Because Log Cabin Homes' web site has been disabled since March 17, 2011, Log Cabin Homes has lost, and will continue to lose, substantial sales and revenues as a result of Cabela's conduct;

• Loss of Customers to Competitors. Persons who would otherwise have visited Log Cabin Homes' web site and purchased a log cabin home or other products from Log Cabin Homes have visited the web sites of other log home manufacturers and have purchased log cabin homes and other products from those manufacturers;

• Loss of Long-Time Employees. Log Cabin Homes has twenty-four employees, many of whom have been with the company for a significant period of time, whose duty is to monitor visitors to the company's web site and interact with those visitors by "chatting" with the visitors in a chat box on the web site. More specifically, when a visitor has browsed on the Log Cabin Homes' web site for a specified period of time, an employee of Log Cabin Homes initiates a chat session with that visitor through a chat box that pops up on Log Cabin Homes' web site. The Log Cabin Homes' employees answer questions that the customers may have, assists the customers with their purchases, and otherwise attempts to sell products to the customers. Since March 17, 2011, those twenty-four

employees have not been able to perform their services because the web site is disabled as a result of Cabela's conduct. Log Cabin Homes has suffered, and continues to suffer, significant losses as a result of having to pay those twenty-four employees despite the fact they are not performing their normal services through Log Cabin Homes' web site. In addition, Log Cabin Homes cannot continue to make such wage payments if the employees are not able to perform their jobs, and thus if Log Cabin Homes' web site is not restored promptly, Log Cabin Homes will be irreparably harmed through the loss of employees;

• Inability to Track Would-Be Visitors to Web Site. Log Cabin Homes does not presently have any way to track the identity or number of customers who have unsuccessfully attempted to access its web site since March 17, 2011.

• Loss of Reputation and Goodwill. The sudden lack of Internet presence has damaged, and will continue to further damage, the reputation and goodwill associated with Log Cabin Homes, both with customers and potential customers and also with dealers, builders, and other professionals who are accustomed to doing business with, or are now seeking to do business with, Log Cabin Homes.

**ANSWER:** Denied.

## FIRST CASE OF ACTION
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

28. Log Cabin Homes incorporates by reference the allegations contained in Paragraphs 1 - 27 above as if fully set forth herein.

**ANSWER:** Cabela's incorporates by reference its answers to Paragraphs 1-27 above as if fully set forth herein.

29. By contacting Wild West Domains and having Log Cabin Homes' entire web site disabled, and by refusing to contact Wild West Domains to have Log Cabin Homes' web site restored, Cabela's has tortiously interfered with Log Cabin Homes' business relationship with Wild West Domains.

**ANSWER:** Denied.

30. Cabela's conduct was improper, unjustified, and unprivileged.

**ANSWER:** Denied.

31. Log Cabin Homes has been irreparably harmed as a result of Cabela's conduct.

**ANSWER:** Denied.

32. Log Cabin Homes is entitled to preliminary and permanent injunctive relief requiring Cabela's to contact Wild West Domains and request that Wild West Domains restore Log Cabin Homes' web site.

**ANSWER:** Denied.

## SECOND CASE OF ACTION
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES

33. Log Cabin Homes incorporates by reference the allegations contained in Paragraphs 1 - 32 above as if fully set forth herein.

**ANSWER:** Cabela's incorporates by reference its answers to Paragraphs 1-32 above as if fully set forth herein.

34. By contacting Wild West Domains and having Log Cabin Homes' web site disabled, and by refusing to contact Wild West Domains to have Log Cabin Homes' web site restored, Cabela's has tortiously interfered with Log Cabin Homes' business expectancies with customers who engage in business with Log Cabin Homes through Log Cabin Homes' web site.

**ANSWER:** Denied.

35. Cabela's conduct was improper, unjustified, and unprivileged.

**ANSWER:** Denied.

36. Log Cabin Homes has been irreparably harmed as a result of Cabela's conduct.

**ANSWER:** Denied.

37. Log Cabin Homes is entitled to preliminary and permanent injunctive relief requiring Cabela's to contact Wild West Domains and request that Wild West Domains restore Log Cabin Homes' web site.

**ANSWER:** Denied.

## JURY DEMAND

38. Log Cabin Homes respectfully requests trial by jury in Omaha, Nebraska.

**ANSWER:** Denied as LCH has failed to request relief supporting a request for trial by jury.

## ANSWER TO LCH'S PRAYER FOR RELIEF

As to all Prayers for relief set forth in the Complaint, Cabela's denies that LCH is entitled to any relief as alleged or otherwise.

All other averments in the Complaint not specifically admitted or denied are hereby denied.

## AFFIRMATIVE DEFENSES

### Facts Supporting Cabela's Affirmative Defenses

1. On or about August 27, 2010, the parties entered into a Licensing Agreement whereby LCH was granted a license to use certain Cabela's trademarks in the field of log cabins and log cabin homes with specific restrictions as to how the Cabela's marks could be used. For example, the Cabela's marks were "never [to] be used in such a way to give the appearance that any Licensed Product is manufactured and/or distributed by Cabela's or that [LCH] is in any way owned by Cabela's", "[LCH] shall not have the right to otherwise sub-license, share, convey, transfer, assign or encumber the License without prior written consent of Cabela's", and "[b]efore [LCH] may use the Licensed Mark in promotional or advertising materials [including use in domain names and the placement of the Cabela's badge], [LCH] must first submit specimens or samples of said promotional or advertising materials and must receive written approval from Cabela's regarding such promotional or advertising materials." (License Agreement, filed as Exhibit A to Plaintiff's Index Of Evidence In Support Of Motion For Temporary Restraining Order And Preliminary Injunction.)

- 11 -

OMA-322910-1

2. The August, 2010 Licensing Agreement superseded and replaced any prior agreements between the parties.

3. LCH made a payment owed to Cabela's under the terms of the Licensing Agreement on or about October 15, 2010.

4. As early as October, 2010, Cabela's notified LCH that LCH was using Cabela's marks in ways that violated the Licensing Agreement.

5. For example, in an October 25, 2010 e-mail from Cabela's to LCH, Cabela's stated "[t]o be clear, the intent of the Licensing Agreement between Cabela's and Log Cabin Homes is the grant by Cabela's to Log Cabin Homes to use the Cabela's marks to identify the corporate partnership, and shall not imply that Cabela's manufactures Log Cabin Homes, nor that Cabela's owns Log Cabin Homes." (October 25, 2010 E-mail Correspondence, attached to the Index of Evidence as Exhibit A.1.)

6. Around this time, it became clear to Cabela's that LCH was making, and intended to make, further uses of Cabela's marks that went well beyond the scope of the Licensing Agreement. For example, LCH was making unauthorized uses of Cabela's marks through unauthorized press releases, selling unauthorized "Cabela's branded camping kits," and allowing others the right to use the Cabela's name in advertising. (October 27 and 28, 2010 E-mail Correspondence, attached to the Index of Evidence as Exhibit A.2.)

7. On or about October 29, 2010, Cabela's became aware that LCH was making further unauthorized uses of Cabela's marks on the LCH website (www.logcabinhomes.com). For example, LCH was advertising itself as being "Outfitted by Cabela's," advertising itself as Cabela's "first Trademark Licensee," issuing unauthorized press releases, advertising

unauthorized product associations with Cabela's, and advertising a strikingly similar "Mission Statement" to Cabela's copyrighted Mission Statement.

8. To protect its valuable intellectual property, on November 8, 2010, Cabela's attorney sent LCH a letter detailing many of the unauthorized uses of the Cabela's marks on LCH's website and reiterating that the Licensing Agreement allowed LCH to use the Cabela's marks only to identify the parties' corporate partnership and to offer a log cabin for sale to the general public as a "Cabela's Edition" Log Cabin Home manufactured by LCH, but not in such a way as to imply that Cabela's manufactures LCH homes or that Cabela's owns LCH. (November 8, 2010 Letter from K&L Gates to LCH, attached to the Index of Evidence as Exhibit A.3.)

9. On November 12, 2010, LCH repudiated the Licensing Agreement stating "You are hereby put on notice that pusuit [sic] to **General Provisions 11.3** in our agreement of the 1st of August, 2010; due to the subsequent actions and inactions by your client, Log Cabin Homes Ltd. is unable to perform in accordance to the terms and conditions of the aforesaid agreement." (November 12, 2010 Letter from LCH to K&L Gates, attached to the Index of Evidence as Exhibit A.4.)

10. On November 19, 2010, Cabela's Vice President of Marketing, Tom Rosdail, e-mailed LCH to again clarify the proper uses of Cabela's marks under the Licensing Agreement, detailing further unauthorized uses of the Cabela's marks by LCH and inviting LCH to a meeting at Cabela's to resolve any remaining confusion. (November 19, 2010 e-mail from T. Rosdail to LCH, attached to the Index of Evidence as Exhibit A.5.)

11. On or about November 29, 2010, LCH responded to Mr. Rosdail's November 19, 2010 e-mail reiterating its repudiation of the License Agreement stating, "Thus we have no

choice but to reiterate our notice to you that we sent to your Chicago attorney Mr. Alan Barry in our letter to him dated November 12, 2010 that: Again; you are hereby put on notice that pusuit to **General Provisions 11.3** in our agreement of the 1st of August, 2010; due to subsequent actions and inactions by Cabela's, Log Cabin Homes Ltd. is unable to perform in accordance to the terms and conditions of the aforesaid agreement." (November 29, 2010 Letter from T. Vesce to T. Rosdail, attached to the Index of Evidence as Exhibit A.6.)

12. Subsequently, Mr. Rosdail attempted to reach Mr. Ernest Vesce of LCH by telephone. Mr. Vesce stated that he was prohibited from speaking to Mr. Rosdail because of the November 18, 2010 letter from K&L Gates LLP.

13. On or about December 1, 2010, Mr. Ernest Vesce sent a letter to Mr. Rosdail repeatedly stating that no one at LCH was permitted to speak with Cabela's directly and demanding various actions by Cabela's including that it participate in a conference call with LCH and The Bentley Group, a LCH distributor, the week of December 12, 2010. Mr. Vesce's letter closed with "[p]lease provide your lawyer with your instructions, and when I receive his letter, I will make contact with you within 10 days of receipt. Until then, no one is permitted to talk to Cabela's until we receive a letter from your Lawyer, stating that it is just fine to talk to one another." (December 1, 2010 Letter from E. Vesce to T. Rosdail, attached to the Index of Evidence as Exhibit A.7.)

14. On December 3, 2010, K&L Gates LLP, Cabela's lawyers, sent Mr. Ernest Vesce a letter clarifying that LCH was and had always been authorized to communicate with Cabela's directly. (December 3, 2010, Letter from K&L Gates to E. Vesce, attached to the Index of Evidence as Exhibit A.8.)

15. On December 9, 2010, Mr. Ernest Vesce sent K&L Gates LLP a letter further reiterating LCH's repudiation of the Licensing Agreement and demanding that Mr. Tom Rosdail of Cabela's be on a conference call with Mr. Tom Vesce and The Bentley Group on or about December 13, 2010 at approximately 2:00 pm EST. (December 9, 2010 Letter from E. Vesce to K&L Gates LLP, attached to the Index of Evidence as Exhibit A.9.) Mr. Rosdail made himself available for the conference call, however, neither Mr. Vesce, nor any representative of LCH or Bentley called in to participate in the call. Mr. Rosdail then phoned Mr. Vesce at which time Mr. Vesce informed Mr. Rosdail that the call was off.

16. On December 17, 2010, Mr. Chris Sprangers, a Marketing Manager at Cabela's, contacted Mr. Ernest Vesce to obtain certain deliverables owed to Cabela's by LCH under the Licensing Agreement, such as advertising creative for Cabela's catalogs.

17. Mr. Ernest Vesce replied via e-mail to Mr. Sprangers that same day refusing to provide the deliverables and again reiterating LCH's repudiation of the Licensing Agreement. For example, Mr. Vesce stated, "[l]et me be perfectly clear, the product launch, and all other matters and deadlines, are postponed until such time that Mr. Alan Barry responds to Mr. Tom Vesce's Letter, and to other questions asked of Mr. Tom Rosdail." Mr. Vesce's e-mail further states, ". . . every single point that Mr. Tom Vesce raised in his letter needs to be addressed to our satisfaction, along with those questions asked of Mr. Rosdail. Then we will request that the Licensing agreement that [LCH] signed on August 1, 2010 be modified, so that no one at Cabela's can roll out the 'Red Tape,' and engage another lawyer to again place [LCH] on 'Notice,' at some point in the future." (December 17, 2010 e-mail from E. Vesce to C. Sprangers, attached to the Index of Evidence as Exhibit A.10.)

18. Cabela's relied on LCH's repeated repudiations of the Licensing Agreement by removing advertising from the Cabela's website, pulling future catalog and television advertisements and canceling scheduled advertisements referenced in the License Agreement.

19. Due to LCH's repeated repudiation of the License Agreement, its refusal to perform under the Licensing Agreement and to the nature of the correspondence from LCH, Cabela's believed that the parties' relationship had deteriorated beyond repair. Accordingly, on December 30, 2010, Mr. Rosdail sent a letter to Mr. Ernest Vesce notifying LCH that Cabela's considered the License Agreement terminated. (December 30, 2010 Letter from T. Rosdail to E. Vesce, attached to the Index of Evidence as Exhibit A.11.)

20. On January 3, 2011, LCH responded with a letter purportedly refusing to accept termination of the Licensing Agreement and yet accusing Cabela's of breaching the agreement. (January 3, 2011 Letter from T. Vesce to T. Rosdail, filed as Exhibit D to Plaintiff's Index Of Evidence In Support Of Motion For Temporary Restraining Order And Preliminary Injunction.)

21. Paragraph 4.5 of the Licensing Agreement provides that "[t]ermination of this Agreement shall not relieve any of the Parties of its then outstanding and unfulfilled obligations or liabilities under this Agreement, including without limited the generality of the foregoing, any obligation related to the payment of License Fees due to Cabela's for Licensed Products."

22. On January 15, 2011, LCH continued its non-performance and reiterated its repudiations when it failed to make a payment owed to Cabela's under the terms of the Licensing Agreement.

23. On January 19, 2011, Cabela's attorneys sent LCH a letter reiterating that the Licensing Agreement was terminated due to LCH's repeated repudiation. (January 19, 2011 Letter from K&L Gates LLP to E. Vesce, attached to the Index of Evidence as Exhibit A.12.)

24. On February 15, 2011, Cabela's attorneys sent LCH a letter demanding that LCH stop using Cabela's marks and advertising an affiliation with Cabela's. (February 15, 2011 Letter from K&L Gates LLP to E. Vesce, attached to the Index of Evidence as Exhibit A.13.)

25. LCH refused to comply with Cabela's demand.

26. On March 9, 2011, Cabela's filed a Complaint for Trademark Infringement and Unfair Competition in this District. (Case No. 8:11-cv-00088, Dkt. No. 1.)

27. Wild West Domains, Inc. ("Wild West") is the host for LCH's website, www.logcabinhomes.com.

28. Wild West has established policies for considering trademark and/or copyright infringement claims posted online at

http://www.wildwestdomains.com/agreements/ShowDoc.aspx?pageid=TRADMARK_COPY.

29. On March 17, 2011, Cabela's lawyers sent a Trademark Claim Notice to Wild West pursuant to Wild West's Trademark And/Or Copyright Infringement Policy. (March 17, 2011 Letter from K&L Gates LLP to Wild West, attached to the Index of Evidence as Exhibit A.14; Wild West Policy,

http://www.wildwestdomains.com/agreements/ShowDoc.aspx?pageid=TRADMARK_COPY.)

30. LCH never filed a counter-notification with Wild West to justify reinstating its website per Wild West's counterclaim policy. (March 21, 2011 E-mail from Wild West to K&L Gates LLP, attached to the Index of Evidence as Exhibit A.15.)

**First Affirmative Defense**

(Cabela's Actions Were Justified)

31. Cabela's has had throughout the relevant time period, valid, enforceable trademarks in the marks licensed to LCH under the parties' Licensing Agreement.

32. Cabela's has the legal right to enforce its marks.

33. LCH's Licensing Agreement to use Cabela's marks in connection with its manufacture and sale of log cabin homes across the country and Canada was terminated based on repeated repudiation through words and deeds of LCH.

34. Cabela's materially relied on LCH's repudiation and notified LCH that Cabela's considered the repudiation to be final.

35. Despite termination of LCH's former license to use the Cabela's Marks and its obligation to cease any and all use of the Cabela's Marks, LCH continued to display the Cabela's Marks and advertise an affiliation with Cabela's on defendant's website (http://www.logcabinhomes.com/), and through various third-party advertising channels.

36. LCH also ceased performing under the Licensing Agreement at least as of November 12, 2010 including failing to make required royalty payments owed to Cabela's under the terms of the Licensing Agreement.

37. Cabela's, therefore, has a good faith belief that LCH was and is infringing Cabela's trademarks.

38. Cabela's followed Wild West's Trademark And/Or Copyright Infringement Policy when it provided notice of its trademark claim against LCH to Wild West.

39. Cabela's was and is legally justified in protecting its valuable intellectual property by notifying Wild West Domains and other third parties of the past and ongoing infringement of the Cabela's marks.

**Second Affirmative Defense**

(Failure to State a Claim)

40. LCH's Complaint fails to state a claim for which relief can be granted.

**Third Affirmative Defense**

(Failure to Mitigate)

41. LCH failed to mitigate its alleged claims and/or damages.

### Fourth Affirmative Defense

(Failure to Join Indispensable Parties)

42. LCH has failed to join necessary and indispensable parties, namely Wild West.

### Fifth Affirmative Defense

(Unclean Hands)

43. LCH's claims are barred by the doctrine of Unclean Hands.

### Sixth Affirmative Defense

(Estoppel)

44. LCH's claims are barred the doctrine of estoppel.

### Seventh Affirmative Defense

(Waiver)

45. LCH's claims are barred by the doctrine of waiver.

### Eighth Affirmative Defense

(Economic Loss Doctrine)

46. LCH's claims are barred by the economic loss doctrine.

### Ninth Affirmative Defense

(Mistake)

47. LCH's claims are barred by the affirmative defense of mistake.

WHEREFORE, Cabela's, having fully answered the allegations contained in Plaintiff's Complaint, respectfully requests that this action be dismissed at Plaintiff's cost and for an order that Plaintiff is liable for Cabela's costs and expenses, including attorneys' fees, incurred in responding to this matter.

Dated: April 6, 2011.

                Respectfully submitted,

                By: s/ Victoria H. Buter_____
                   Thomas H. Dahlk (#15371)
                   Victoria H. Buter (#23841)
                   HUSCH BLACKWELL LLP
                   1620 Dodge Street, Suite 2100
                   Omaha, NE 68102
                   Telephone: (402) 964-5000
                   Facsimile: (402) 964-5050
                   tom.dahlk@huschblackwell.com
                   vicki.buter@huchblackwell.com

                   AND

                   Alan L. Barry
                   Christopher J. Fahy
                   K&L GATES LLP
                   70 West Madison Street, Suite 3100
                   Chicago, Illinois 60602
                   Telephone: (312) 372-1121
                   Facsimile: (312) 827-8000
                   alan.barry@klgates.com
                   christopher.fahy@klgates.com

                   Attorneys for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of April, 2011, I electronically filed the above using the CM/ECF system which sent notification of such filing to the following:

      Mark C. Laughlin         mlaughlin@fraserstryker.com
      Patrick S. Cooper          pcooper@fraserstryker.com

                   s/Victoria H. Buter_____